THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CHARLES REA, Defendant-Appellant.

Fifth District    No. 75-406

Opinion filed March 14, 1977.—Rehearing denied April 27, 1977.

Mudge and Riley Law Offices, of Edwardsville, for appellant.

Nicholas G. Byron, State's Attorney, of Edwardsville (Bruce D. Irish and Raymond F. Buckley, Jr., both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE CARTER delivered the opinion of the court:

Defendant, Charles Rea, appeals from a judgment of the trial court of Madison County sentencing him to a minimum of two years and a maximum of 10 years to the Illinois Department of Corrections after a jury found him guilty of the crime of attempted murder of his wife.

Defendant raises several questions on review which all can be reduced to the single question of whether the trial court erred in holding that there was insufficient evidence to submit the question of defendant's sanity to the jury.

The incident in question occurred on the morning of December 26,

1974. Mrs. Rea, the victim and wife of the defendant, had left her mother's home and proceeded to the defendant's brother's house to leave the children while she was at work. She then proceeded down the highway in her automobile on her way to work. After traveling a short distance, she passed the defendant going the opposite direction. He turned his automobile around and motioned for her to pull over. After she complied, the defendant entered her car, and they began discussing their marital difficulties. The defendant then struck his wife, and left the car. Mrs. Rea then proceeded in a direction other than towards St. Louis, Missouri where she was employed and after observing that defendant was following her she attempted to elude him. When he later blocked the road in front of her, she pulled into the driveway of a house whose residents she did not know. The defendant approached the driver's side of his wife's vehicle and asked that she talk to him. When she looked at him he shot her in the head through the window and fired twice more, one of the bullets striking her in the back. Mrs. Rea received aid from the people living in the neighborhood and was rushed to the hospital. The defendant returned to his home and called his brother, telling him that he thought he had hurt his wife.

The defendant and his wife had been separated since the later part of November 1974 when Mrs. Rea left the marital residence taking the two children of the marriage. The defendant was uneducated and worked at his brother-in-law's auto body shop.

At the trial, one of the defendant's brothers, who is a policeman, testified that the defendant had become withdrawn and nervous shortly after he and his wife had separated. About two weeks after their separation the defendant had called his brother asking for help. He wanted the brother to get a doctor to help the defendant, as he told him, "because you won't see me after tonight."

Another of defendant's brothers testified that before defendant separated from his wife he was an independent person, but that afterwards he was greatly agitated all the time and was losing weight. He testified that the day before the incident, the defendant was very withdrawn during a reunion with a younger brother whom he had not seen for about 10 years. This witness said the defendant had the feeling that they (the brothers) didn't care about the defendant's separation. This brother stated that he had gone to the home of the defendant shortly after the incident and had found him in a hysterical state of mind. He testified that the defendant threatened suicide, whereupon he asked the defendant where the gun was and was directed to the back room. Defendant then pulled a gun out from under a cushion he was sitting on and attempted to shoot himself. The brother grabbed the gun away from the defendant who then slumped back into the couch.

Another brother testified that the defendant on the day before the incident was strange and irrational, and that he had never seen him like that before. One of the defendant's brothers-in-law who employed him at his automobile shop testified that after defendant's separation from his wife, his work deteriorated and his mind was preoccupied. A coworker of defendant said on the witness stand that the defendant was "falling to pieces" after the separation.

Neither counsel asked any of the lay witnesses whether they thought the defendant could or could not understand the criminality of his acts or conform his conduct to the law.

A psychiatrist testified that the defendant had come under his care at Barnes Hospital in St. Louis, Missouri, on January 2, 1975, only one week after the incident involved in this case. He testified that he had seen the defendant personally many times during his four week stay at the hospital and had reviewed his case daily. He further stated that he had performed many tests on the defendant of both a psychological and physical nature. He stated that the defendant was on January 2, 1975, suffering from depression, which in the medical sense was something different from ordinary "depression" as lay persons understand it. He said that it was a mental disease, and that to a medical certainty he thought the defendant was suffering from it during the months of November and December of 1974. In answer to the question of whether the psychiatrist could to a medical certainty state that the defendant lacked the substantial capacity to appreciate the criminality of his conduct, he said, "I don't know." The doctor also stated that he thought the defendant was "well" by the latter part of January 1975.

A psychologist who had seen the defendant twice before the incident, testified as to his conversations with him. He stated that on the first meeting the defendant had a great need to ventilate his problems with his wife who had moved out of their home. During the second meeting the defendant told him that he had attempted suicide. The psychologist said that he thought the defendant did not suffer from a psychosis (severe depression) but a milder form—depressive neurosis. This was never labeled a mental disease by the witness nor by anyone else.

At the conclusion of the evidence, the trial judge ordered the testimony of the psychiatrist and psychologist stricken from the record and instructed the jury to totally disregard it on the basis of two recent Illinois Supreme Court cases, *People v. Redmond* 59 Ill. 2d 328, 320 N.E. 321, and *People v. Smothers,* 55 Ill. 2d 172, 302 N.E.2d 324. We must review the testimony in those cases to better understand the law to be derived from them. *Redmond* and *Smothers* deal only with lay witnesses, while the case at hand involves both lay and expert witnesses.

*Redmond* involved a defendant charged and convicted of aggravated

battery, deviate sexual assault and armed robbery. The appellate court reversed the conviction saying that sufficient evidence of insanity had been introduced to require the State to prove defendant's sanity beyond a reasonable doubt.

Our supreme court, in reversing the appellate court in *Redmond*, cited *Smothers* for the proposition that in order to present the issue of defendant's insanity, the evidence must raise a reasonable doubt of his sanity at the time of the incident. The court also looked to the Commentary to the section of the Criminal Code pertaining to affirmative defenses. The Commentary states that unless the evidence is sufficient to warrant submitting the issue to the jury, and to raise a reasonable doubt as to defendant's guilt, it will not be of substantial benefit to him. The court further said that this supports the conclusion that the evidence must raise a reasonable doubt as to the defendant's sanity, and that the evidence produced had *not* rebutted the presumption of sanity.

In *Smothers* the trial court found the defendant guilty of murder and the appellate court affirmed. The Supreme Court, in affirming, reviewed the evidence most favorable to the defendant and found the testimony, at most, showed "an 'abnormality manifested only by * * * otherwise antisocial conduct,' a condition specifically excluded from the statutory terms of 'mental disease' or 'mental defect.' " It also stated that while the evidence showed irrational, bizarre conduct and some degree of confusion on the part of the defendant at the time of the incident, the circuit court had not erred in refusing instructions on sanity.

■■ The court in *Smothers* said that a witness does not have to have an opinion of the sanity or insanity of the defendant at the time of the incident for his testimony to be relevant. (*People v. Smothers*, 55 Ill. 2d 172, 175.) In the present case, the psychiatrist said he thought the defendant was insane the months before, during and after the incident. When he stated he did not know if this insanity prevented the defendant from appreciating the criminality of his conduct, he was giving an honest answer to a tough question. *Smothers* suggests that he did not have to express an opinion, but the State would have us hold that if the psychiatrist testified to anything less than that the defendant, due to his insanity, could not appreciate the criminality of his conduct, then as a matter of law the defense has not raised a reasonable doubt as to the defendant's sanity. This rationale forces the defendant to seek out a doctor who will mouth the magic words according to the language of the appropriate statute. This would be form over substance.

■■ The amount and quality of evidence in this case greatly outweighs that introduced in either *Redmond* or *Smothers* so far as raising a doubt as to the defendant's sanity is concerned. In our opinion, the trial court had

before it sufficient evidence to raise a reasonable doubt as to the defendant's sanity. Therefore, it was error for the judge to refuse to instruct the jury on this question.

For the foregoing reasons, the judgment of the Circuit Court of Madison County is reversed and this case is remanded for a new trial.

Reversed and remanded.

EBERSPACHER and KARNS, JJ., concur.